**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 9, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MARKWEST HYDROCARBON,
INC.; MARKWEST ENERGY
PARTNERS, L.P.; MARKWEST
ENERGY APPALACHIA, L.L.C.,

     Plaintiffs-Appellants,

v.

LIBERTY MUTUAL INSURANCE
COMPANY; BIRMINGHAM FIRE
INSURANCE COMPANY OF
PENNSYLVANIA; ACE AMERICAN
INSURANCE COMPANY; ARCH
INSURANCE COMPANY,

    Defendants-Appellees.

No. 08-1186

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:05-cv-01948-RPM-KLM)**

---

Thomas D. Leland, Messner & Reeves, L.L.C., Denver, CO (Leah E. Capritta, Messner & Reeves, L.L.C., Denver, CO, and Edward M. Joyce, Heller Ehrman, L.L.P., New York, NY, with him on the briefs) for Plaintiffs-Appellants.

William A. Webster (David S. Evinger and Elizabeth D. Le, with him on the brief) Robins, Kaplan, Miller & Ciresi, L.L.P., Los Angeles, CA, for Defendants-Appellees.

---

Before **KELLY, EBEL,** and **GORSUCH**, Circuit Judges.

**GORSUCH**, Circuit Judge.

An explosion in a natural liquid gas pipeline operated by MarkWest caught the attention of the U.S. Office of Pipeline Safety. That office ordered MarkWest to conduct a series of tests on its pipeline, and to repair "integrity threatening conditions" discovered in the course of those tests. MarkWest filed a claim with its insurance carriers seeking to recoup certain loses it incurred as a result of the explosion and its compliance with the government's mandated tests and repairs. The insurers denied coverage, and MarkWest filed this suit, seeking declaratory relief and damages for breach of contract and bad faith breach of insurance contract. The district court eventually granted summary judgment to the insurers, and MarkWest now appeals. We affirm the district court's decision because the insurance policy in dispute does not cover costs incurred to maintain the pipeline.

MarkWest leases and operates a 65-mile stretch of natural gas liquids ("NGL") pipeline running between Maytown, Kentucky, and Ranger, West Virginia.[1] The pipeline, which is one segment of a larger system of pipelines operated by MarkWest and known as the Appalachian Liquids Pipeline System, was originally built in 1957. It is constructed of four-inch and five-inch diameter

---

[1] As always, we recount the facts in the light most favorable to the summary-judgment nonmovant, here MarkWest.

steel pipe, and is separated by flow stations containing a bypass pipe and valve and four-inch raised stem inlet and outlet valves.

On the morning of November 8, 2004, a bypass valve failed at Flow Station Four, located near the Rolling Acres subdivision in Ivel, Kentucky. The failure meant that the valve remained closed, despite its hand wheel showing it to be open, and pressure built up inside the pipeline behind the valve. Eventually, this increased pressure caused a release of NGL through a small hole in the pipeline where the wall had been thinned by corrosion. The escaped NGL caught fire, resulting in explosions, the destruction of five homes in the subdivision, and a number of injuries (but no fatalities).

The Office of Pipeline Safety ("OPS"), a division of the U.S. Department of Transportation charged with ensuring the safe and reliable operation of pipelines, launched an investigation. Ten days after the accident, on November 18, 2004, the OPS issued an initial Corrective Action Order ("CAO"), requiring MarkWest "to take the necessary corrective action to protect the public, property, and the environment from potential hazards associated with a failure involving the four- and five-inch Maytown Station to Ranger Junction segment ('the affected segment') of [MarkWest's] Appalachian Liquid Pipeline System running from near Langley, Kentucky to near South Shore, Kentucky." App. at 491. The CAO

stated that "[t]he cause of the failure has not yet been determined," but went on to

list several preliminary findings, including these:

> Preliminary visual inspection indicated the presence of localized external corrosion around the failure site. Inspectors identified a small hole in the pipeline at the 6 o'clock position when examining the failure site.
>
> The affected segment was hydrostatically tested in 1957 to a pressure of 2925 psig, according to [MarkWest]. Records supporting the 1957 test could not be located.
>
> The pipeline has not been subject to internal inspection. However, [MarkWest] has indicated its intent to perform internal inspection on the pipeline.

*Id.* at 492.

The CAO continued with a section entitled "Determination of Necessity for

Corrective Action Order and Right to Hearing." In it, the OPS described its

reason for issuing the CAO:

> After evaluating the foregoing preliminary findings of fact, I find that the continued operation of the affected segment without corrective measures would be hazardous to life, property and the environment. Additionally, after considering the age of the pipe, the proximity of the pipeline to highways, drinking water sources, and populated areas, the combustible nature of the products the pipeline transports, the pressure required for transporting the material, the history of leaks attributed to corrosion on the pipeline, and the ongoing investigation to determine the cause of the failure, I find that a failure to expeditiously issue this Order requiring immediate corrective action would likely result in serious harm to life, property, or the environment.
> . . .
> After receiving and analyzing additional data in the course of this investigation, OPS may identify other corrective measures that need to be taken. In that event, [MarkWest] will be notified of any additional measures required and amendment of this Order will be considered.

*Id.* at 493.

The CAO then detailed various corrective actions MarkWest had to take. These included hydrostatic pressure testing of the affected pipeline segment to 125% of the existing maximum operating pressure.[2] *Id.* at 494. In addition, MarkWest had to prepare a plan to address "all known or suspected factors that caused or contributed to" the accident. *Id.* at 495. The plan had to include "[t]he performance of appropriate field testing, inspections, and evaluations to determine whether and to what extent the condition(s) associated with the failure, or other integrity threatening trends, are present along the remainder of the affected segment or elsewhere on any portion of the Appalachian Liquid Pipeline System constructed with similar methods and material as the affected segment." *Id.* MarkWest was also required to perform "appropriate repairs, pipe replacement, or other corrective measures fully remediating the integrity threatening condition(s) associated with the failure everywhere along the pipeline where such conditions are identified by the evaluation process." *Id.*

The OPS issued an amendment to the CAO one day later, in which it made supplemental comments. An additional finding of fact noted that "[t]he ongoing investigation of the November 8, 2004 failure . . . has identified a 4-inch raised

---

[2] The test involves pumping liquid through the pipeline at a high pressure to expose the presence of leaks or weak spots in the line.

stem valve that may have played a role in the pipeline's failure." *Id.* at 499. In a paragraph entitled "Determination of Necessity for Corrective Action Order and Right to Hearing," the OPS added a phrase observing that "the circumstances surrounding . . . the way the valve functioned at the time of the failure" was a factor that led the OPS to "expeditiously issue" the CAO and amendment. *Id.* at 500. A "Discussion of Amendment" section described in detail preliminary findings related to the valve failure, and discussed the need for an independent investigation of the valve "to determine if the valve may not have functioned as specified and [may] have been a contributing factor in the failure that resulted in fires, explosions, nine injuries and the destruction of five homes." *Id.* at 501. A later section of the amendment ordered MarkWest to arrange for such an investigation. *Id.*

After the OPS issued its CAO and amendment, MarkWest sought a hearing "in order to clarify and discuss the requirements for a return to operation." *Id.* at 505. At the hearing, MarkWest proposed – and was granted – a further amendment to the CAO that allowed for "alternative equivalent methods of pipeline integrity testing other than hydrostatic pressure testing." *Id.* at 508. In addition, MarkWest asked for clarification about the meaning of the phrase "integrity threatening condition." *Id.* OPS responded that MarkWest "should not view 'integrity threatening condition' in an overbroad manner. For instance,

corrosion on the pipeline would be an integrity threatening condition . . . , but the consideration of this condition need not extend to soil conditions which might be conducive to corrosion." *Id.*

At the time of the accident, MarkWest carried an "all-risk" property insurance policy with four insurance companies. The policy indemnified MarkWest against "all risks of direct physical loss or damage occurring during the period of this policy from any external cause, except as hereinafter excluded." App. at 512. Relevant to this lawsuit, the policy explicitly stated that it "does not insure . . . corrosion." *Id.* at 516-17. It further provided that the insurance companies "shall not be liable for any increase in loss resulting from . . . [e]nforcement of any ordinance or law regulating the use, construction, repair or demolition of any property." *Id.* at 522. It did, however, have a provision, the Demolition and Cost of Construction Endorsement ("DICC Endorsement"), providing up to $5 million in coverage for specific losses resulting from the enforcement of laws and ordinances regulating the "construction or repair" of damaged property:

Demolition and Increased Cost of Construction Endorsement

Liability for loss under this Endorsement arising out of one occurrence shall not exceed $5,000,000.

In the event of loss or damage by an insured peril under this policy that causes the enforcement of any law or ordinance regulating the construction or repair [of] damaged facilities, underwriters shall be liable for:

\* \* \*

C. Increased cost of repair or reconstruction of the damaged and undamaged facility on the same or another site and limited to the minimum requirements of such law or ordinance regulating the repair or reconstruction of the damaged property on the same site. However, the Company shall not be liable for any increased cost of construction loss unless the damaged facility is actually rebuilt or replaced.

D. Any increase[] in the Business Interruption and extra expense loss arising out of the additional time required to comply with state law or ordinance.

*Id.* at 522-23.

MarkWest promptly reported the November 8, 2004 accident to its insurers, and submitted claims for direct losses to property sustained as a result of the accident, as well as for expenses sustained as a result of compliance with the CAOs. MarkWest took the position that the latter costs were covered by the DICC Endorsement. The insurers disagreed and issued a position letter denying coverage. Regarding MarkWest's losses caused by the explosion, the insurers argued that the principal cause of the accident was corrosion and accordingly MarkWest's losses were not covered by the policy. *Id.* at 257-58. Regarding the expenses MarkWest sustained in complying with the CAOs, the insurers contended, among other things, that:

> [e]ven assuming that the OPS Corrective Action Order is a "law" or "ordinance," there would be coverage only if it is regulating the "*construction or repair*" of the *damaged* pipeline. While the exclusion applies to increased time element losses resulting from a law or ordinance regulating the "*use, construction, repair or demolition*" of *any* property, the Endorsement adds back coverage only for increased time element losses

resulting from a law or ordinance regulating the "*construction or repair*" of *damaged* property. Thus, absent from the Endorsement is coverage for increased time element losses resulting from a law or ordinance regulating the "*use*" of any property.

. . .

While the Corrective Action Order may have regulated the "use" of the entire pipeline, it does not appear to have regulated the repair of the damaged portion of pipeline.

*Id.* at 260 (emphasis in original). The insurers added another reason for denying coverage. For coverage to apply under the DICC, they noted, an insured peril must cause the enforcement of a law or ordinance. Here however, they argued, the OPS acted out of concern for corrosion in the pipeline, and corrosion is a peril expressly excluded, not insured, by the terms of MarkWest's policy. *Id.* at 260-61.

In response to the insurer's position letter, MarkWest filed suit in state court. The company sought a declaratory judgment against its insurers, as well as damages for breach of contract and bad faith breach of an insurance contract. The insurance companies removed the suit to federal court and filed a motion for summary judgment to dismiss the suit on all claims. In due course, the district court granted the motion.

With respect to MarkWest's claim for losses arising from the explosion, the district court disagreed with the insurance companies' claim that the "undisputed evidence here proves that the cause of the Ivel incident . . . was corrosion." *Id.* at

374; Dist. Ct. Op. at 3. The court noted MarkWest's contrary evidence that the precipitating cause was the valve failure, not corrosion, and stressed that "[t]here are conflicting expert opinions submitted on this point." *Id.* The court concluded that MarkWest "has shown a triable issue of fact as to whether this loss would have occurred without the valve failure." *Id.* Yet, this did not end the matter. The district court continued by noting that the covered property losses from the accident were small; in fact, MarkWest conceded that they were "substantially less" than the $250,000 deductible under the policy.[3] *Id.* at 3. In light of this concession and its grant of summary judgment to the insurers on MarkWest's remaining claim for coverage, the district court concluded that it had no choice but to grant summary judgment to the insurance defendants.

The district court next granted summary judgment to the insurers on MarkWest's claim for its costs in complying with the OPS's various directives. While the accident itself may have been caused by a valve failure, the district court reasoned, "[t]he Ivel incident was the cause of the OPS order only in the sense that it gave notice to the OPS that the pipeline had a history of leaks resulting from corrosion. . . . The only reasonable inference from reading the three OPS orders is that the investigation and remediation of the 65 mile segment

---

[3] It appears from the record that the explosion inflicted very little damage to property covered under the policy, and that only a small section of the pipeline required replacement. *See* App. at 389, 1512.

was caused by the evidence of corrosion. The possibility of a valve failure was not a relevant factor." *Id.* at 6-7. Because the court found the cause of the OPS's directives to be the product of concerns about corrosion, an excluded peril under the terms of the policy, the district court held that the insurance companies had no duty to reimburse MarkWest for its compliance costs. The district court also granted summary judgment to the insurers on MarkWest's claim that they denied coverage in bad faith. This appeal followed.

Before us, MarkWest does not seek to disturb the district court's grant of summary judgment with respect to its claims for property losses caused by the explosion. Instead, MarkWest argues that a reasonable jury could conclude that the CAO and its amendments were not issued solely out of concern for corrosion, but rather were issued for a variety of reasons, including concern about potentially faulty valves elsewhere along the pipeline. Accordingly, MarkWest continues, its costs of complying with the government's mandates are compensable under the terms of its insurance policy. MarkWest also seeks to resuscitate its bad faith denial claim.

As with any other appeal from a summary judgment disposition, we review MarkWest's arguments *de novo*, viewing the facts and all reasonable inferences those facts support in the light most favorable to MarkWest. *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1195 (10th Cir. 2008). We will affirm a

grant of summary judgment if but only if the evidence reveals no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The construction of an insurance policy is a matter of law. *Adams-Arapahoe Joint Sch. Dist. No. 28-J v. Continental Ins. Co.*, 891 F.2d 772, 774 (10th Cir. 1989). We assess the policy under Colorado law, which the parties agree governs their diversity contract dispute.

The parties' dispute centers on the meaning of the DICC Endorsement. The Endorsement specifies that in the "event of loss or damage by an insured peril under this policy that causes the enforcement of any law or ordinance regulating the construction or repair [of] damaged facilities, underwriters shall be liable for . . . ." App. at 522. As a prerequisite for liability, then, two conditions must be met: (1) an insured peril must cause the enforcement of (2) a law or ordinance regulating the construction or repair of damaged facilities. To be sure, if both of these conditions are satisfied, the DICC Endorsement renders the insurers liable for "[i]ncreased cost of repair or reconstruction of the damaged *and undamaged* facility on the same *or another site*." *Id.* But to reach this recovery MarkWest must clear both contractual hurdles placed in its way.

The district court granted summary judgment because, in its view, MarkWest stumbled at the first hurdle. While valve failure may have caused the accident, the court reasoned, it was beyond cavil that the OPS issued the CAOs

- 12 -

and its amendments out of concern with corrosion in the pipeline.  On appeal, MarkWest replies that these conclusions are logically incongruous.  It reasons that, if a reasonable jury could find that the explosion was caused by valve failure, and the OPS intervened and issued its CAO and amendments because of the explosion, surely a reasonable jury could also conclude that the OPS acted out of concern for valve failures and not simply corrosion.

Whatever the merits of MarkWest's chain of reasoning – and we do not pass on it – it fails to get the company home.  For MarkWest's losses to be covered by the Endorsement, the OPS's directives at issue still must "regulat[e] the construction or repair of damaged facilities."  They do not.

Under Colorado law "an insurance policy must be given effect according to the plain and ordinary meaning of its terms." *Farmers Ins. Exch. v. Dotson*, 913 P.2d 27, 30 (Colo. 1996).  We begin, then, by considering whether the CAO and amendments "regulat[e] the construction or repair of damaged facilities."  The plain meaning of the word "construction" denotes "forming" or "building." Oxford English Dictionary 794 (2d ed. 1989).  But the CAO and its amendments did not require MarkWest to form, build, or "construct" anything.  OPS required only that MarkWest test and take remedial actions to maintain the safety of a pipeline constructed over a half-century ago, in 1957.

Neither did the CAO or its amendments require the *repair of damaged* facilities. The Endorsement specifies that coverage exists only "[i]n the event of *loss or damage by an insured peril* . . . that causes the enforcement of any law or ordinance regulating the construction or repair [of] *damaged facilities* . . . ." Moreover, in defining the extent of the liabilities covered, the Endorsement refers to the law or ordinances insured against as those "regulating the repair or reconstruction *of the damaged property*." By the contract's plain terms, then, only laws or ordinances regulating "property" or "facilities" that have been damaged by an insured peril are covered. *See City of Arvada v. Co. Intergovernmental Risk Sharing Agency*, 988 P.2d 184, 187 (Colo. App. 1999) ("Words in an insurance contract cannot be read in isolation, but must be considered in context . . . .").

Even assuming that the Ivel accident was caused by an insured peril (a valve failure), by everyone's admission the insured peril damaged, at most, only a small stretch of the pipeline (causing less than $250,000 in damage to that section). And the CAOs did not seek to tell MarkWest whether and how to repair this small stretch of pipeline. OPS was hardly concerned with telling MarkWest how to repair a broken valve stem, or how to repair the broken bits of the pipeline in Ivel. That was yesterday's problem; OPS was concerned about preventing tomorrow's. So the CAOs did not dictate a minor fix to a specific valve or

- 14 -

pipeline segment in Ivel, but instead sought to ensure the safe operation, going forward, of the *entire 65-mile pipeline*. The agency's CAOs directed MarkWest to perform "appropriate field testing, inspections, and evaluations to determine whether and to what extent the condition(s) associated with the failure, or other integrity threatening trends, are present *along the remainder of the affected segment or elsewhere on any portion* of the [pipeline]." Thus, for example, one of the largest costs incurred by MarkWest in complying with the CAOs involved hydrostatically testing the entire pipeline, a procedure done, according to MarkWest's own expert, "primarily . . . to determine a safe operating pressure [at which] the pipeline can be operated." App. at 1676-77. Because the CAOs regulated terms for the safe operation of the entire pipeline, and were not aimed at dictating a fix for the minor damage done to a valve stem or pipeline segment in Ivel, under the plain and unambiguous terms of the DICC Endorsement MarkWest's costs in complying with the CAOs are not covered.[4]

Although we need proceed no further to dispose of this case, we note that our result is additionally supported by an examination of the language and

---

[4] We suppose one might argue that the costs associated with complying with the CAOs at the point of the damaged pipeline in Ivel are compensable under the Endorsement. But MarkWest makes no argument to that effect, perhaps because, as it conceded before the district court, the costs of fixing that bit of the pipeline were small and did not meet the policy's deductible. In any event, because MarkWest does not make the argument, we do not address it.

structure of the policy as a whole. *See Rocha v. Financial Indem. Corp.*, 155 P.3d 602, 606 (Colo. App. 2006) ("[A] contract must be construed to ascertain and effectuate the intent of the parties as determined primarily from the language of the contract. . . . Further, we examine the language in question not in isolation, but by looking to the contract as a whole.") (quotation marks and citations omitted).

The policy plainly indicates that the parties drafted and agreed to an "all-risk" insurance policy. *See* App. at 512 (policy's "all risks" clause); Aplt. Br. at 5 ("The Policy is an 'all-risks' policy . . . ."); Appellee Br. at 2 ("Defendants/Appellees are first-party property insurers who issued an 'all-risk' property insurance policy to MarkWest."). All-risk insurance policies are designed to "cover[] any fortuitous loss not resulting from an excluded risk or from fraud by the insured." *Adams-Arapahoe*, 891 F.2d at 774 (citing *Kane v. Royal Ins. Co. of Am.*, 768 P.2d 678, 679 n. 1 (Colo.1989)). "A fortuitous event . . . is an event which so far as the parties to the contract are aware, is dependent on chance." *Id.* at 775. *See also* Jane Massey Draper, Coverage Under All-Risk Insurance, 30 A.L.R.5th 170 (1995) ("[A] fortuitous event [is] one that is unexpected and not probable, and caused by an external force, that is, not resulting from an internal characteristic of the property. . . .").

To read the policy as covering MarkWest's costs of complying with safety regulations would be to convert the parties' policy against unforeseen fortuities into a maintenance contract. The insurance companies would be responsible for MarkWest's costs in testing the entire stretch of pipeline for any "integrity threatening conditions" – including normal wear and tear – and then repairing those conditions. A pipeline operator could run the least-safe, least-modern, and least well-run pipeline in the country, a pipeline in violation of every regulation in the books. Yet, under MarkWest's reading of the contract, if an accident exposed these problems to the OPS, the insurers would be on the hook for repairing and modernizing the entire pipeline. Though we do not at all suggest MarkWest ran its pipeline in this manner, the result it seeks would create strange incentives indeed, encouraging insureds to tighten their wallets and brush off their regular maintenance obligations. Construing an all-risk policy in the manner MarkWest suggests thus would misallocate the ordinary costs of doing business from the company to the insurer.

The policy before us makes clear that it is susceptible to no such reading – that it protects against unexpected fortuities but not the upkeep necessary for a fifty-two year old pipeline to remain safe to operate. It explicitly provides coverage only for "all risks of direct physical loss or damage . . . *from any external cause*," not normal wear-and-tear. App. at 512. It also excludes from

coverage "any increase in loss resulting from . . . [e]nforcement of any ordinance or law regulating the *use*, construction, *repair* or demolition of *any property*." App. at 522. So regulators may impose safety standards regarding the "use" of the pipeline, and MarkWest must absorb the expense of meeting those standards. Such expenses are the cost of doing business properly internalized by a business, not the sort of unexpected fortuity all-risk policies are designed to cover. *See Port Auth. of New York & New Jersey v. Affiliated FM Ins. Co.*, 311 F.3d 226, 236 (3d Cir. 2002) (holding that a claim that an all-risk policy covers cost of asbestos abatement "would require compensation for repairs caused by the inevitable deterioration of materials used in the construction of the building . . . would not comport with the intent of a first-party 'all-risks' insurance policy, but would transform it into a maintenance contract."); *Chattanooga Bank Assocs. v. Fidelity & Deposit Co. of Maryland*, 301 F.Supp.2d 774, 778-80 (E.D. Tenn. 2004) (refusing to read all-risk insurance policy as covering the costs of remedying code violations discovered after part of a building suffered a fire).[5]

---

[5] As a corollary to its principal argument, MarkWest submits that the district court erred in refusing to admit experts that would opine that the Ivel incident was the cause of the OPS orders. We discern no abuse of discretion in this ruling. The contract was not ambiguous and contained no technical terms, and thus no "scientific, technical, or other specialized knowledge" would "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702; *see also North Am. Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1280-81 (6th Cir. 1997). In any event, as we have held, MarkWest is not covered

(continued...)

Having concluded that the insurance companies' denial of coverage was proper as a matter of law, we must also affirm the district court's grant of summary judgment in their favor on MarkWest's bad faith claim. It is settled law in Colorado that a bad faith claim must fail if, as is the case here, coverage was properly denied and the plaintiff's only claimed damages flowed from the denial of coverage. *See Tynan's Nissan, Inc. v. Am. Hardware Mut. Ins. Co.*, 917 P.2d 321, 326 (Colo. App. 1995); *M.L. Foss, Inc. v. Liberty Mut. Ins. Co.*, 885 P.2d 284, 286 (Colo. App. 1994), *overruled on other grounds by Cyprus Amax Minerals Co. v. Lexington Ins. Co.,* 74 P.3d 294 (Colo. 2003); *Jarnagin v. Banker's Life and Cas. Co.,* 824 P.2d 11, 15 (Colo. App. 1991).

*Affirmed.*

---

[5](...continued)
by the policy no matter why the CAO and its amendments were issued; the proffered expert testimony bears no relevance to, and if received accordingly could not possibly undo, our holding.