**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 10, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

MICHAEL BETHEL,

    Plaintiff - Appellant,

v.

BERKSHIRE HATHAWAY
HOMESTATE INSURANCE COMPANY,

    Defendant - Appellee.

No. 19-1262
(D.C. No. 1:17-CV-01456-CMA-KLM)
(D. Colo.)

_____

**ORDER AND JUDGMENT***
_____

Before **BRISCOE**, **EBEL**, and **LUCERO**, Circuit Judges.
_____

Michael Bethel appeals the district court's grant of summary judgment in favor

of Berkshire Hathaway Homestate Insurance Company on his claims of breach of

contract, common law bad faith, and unreasonable delay or denial of benefits.

Exercising jurisdiction under 28 U.S.C. § 1291, we reverse the court's grant of

summary judgment on Bethel's claims regarding Berkshire Hathaway's use of a real

estate appraisal to value Bethel's property, but we affirm its grant of summary

judgment regarding Bethel's debris removal benefit.

_____

* This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

**I**

This case arises from a fire that occurred at Bethel's property in Rocky Ford, Colorado, in December 2016. Bethel had purchased the property seven months earlier from a friend who loaned him money for the transaction. Bethel added the property to his existing insurance policy with Berkshire Hathaway ("the Policy").

Under the Policy, the property is insured for its "actual cash value" with a limit of $407,000. It includes a "Building and Personal Property Coverage Form," under which it provides coverage for direct physical loss of or damage to the property, subject to the policy limit. This coverage is further subject to the following "Loss Conditions":

> 4. Loss Payment
>     a. In the event of loss or damage covered by this Coverage Form, at our option, we will either:
>         (1) Pay the value of lost or damaged property;
>         (2) Pay the cost of repairing or replacing the lost or damaged property . . . ;
>         (3) Take all or any part of the property at an agreed or appraised value; or
>         (4) Repair, rebuild or replace the property with other property of like kind and quality . . . .
>
>         We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition in this Coverage Form or any applicable provision which amends or supersedes the Valuation Condition.
>     . . .
>     d. We will not pay you more than your financial interest in the Covered Property.

Additionally, under the "Valuation Condition," Berkshire Hathaway "will determine the value of Covered Property in the event of loss or damage . . . [a]t actual cash value as of the time of loss or damage."

Although the Policy itself does not define "actual cash value," Berkshire Hathaway provided Bethel with a "Summary of Coverage" form ("the Summary") stating that "Actual Cash Value is the cost of repairing or replacing damaged property with property of the same kind and quality less depreciation, subject to the limits shown in your declaration page and policy." The Summary further provides:

> This document is a summary of your commercial property coverage. The information in this document does not replace any policy provision. Please read your policy for details! In the event of a conflict between the policy and this disclosure form, your policy provisions shall prevail.

The Summary is not listed in any of the Policy's schedules as one of the forms or endorsements considered to be part of the Policy.

Debris removal is also covered under the Policy. The "Debris Removal" provision states:

> [W]e will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

Berkshire Hathaway's investigator, Steve Hansen, determined that the fire was accidental and that Bethel's property had suffered a total loss covered by the Policy. Berkshire Hathaway issued an advance of $30,000 to Bethel before the appraisal process was complete. It hired a real estate appraiser, who determined that the market value of the property was $109,000 at the time of the fire. Based upon this

3

appraisal, Berkshire Hathaway determined that the value of the property was $109,000, and paid Bethel the remaining $79,000.

In the same letter in which it informed Bethel of the result of the appraisal, Berkshire Hathaway noted the terms of the debris removal coverage available under the Policy. Under the debris removal provision, Bethel was obligated to report debris removal expenses within 180 days of the date of loss. Berkshire Hathaway acknowledged Bethel's previous submission of a debris removal estimate but noted that he had not submitted invoices or evidence of incurred expenses. It requested that Bethel send "invoices, evidence of payment, and any other applicable documentation for the debris removal expense associated with" his claim.

Bethel sued, claiming entitlement to the policy limit of $407,000. He brought claims of breach of contract, common law bad faith, and unreasonable delay/denial of benefits under Colo. Rev. Stat. §§ 10-3-1115 and 1116. The parties filed cross-motions for summary judgment on the meaning of "actual cash value" under the Policy.

The court granted summary judgment favoring Berkshire Hathaway, concluding that Berkshire Hathaway did not breach the contract in evaluating the property according to its market value and that the Summary was not controlling because it conflicted with provisions in the Policy. Regarding Bethel's debris removal claim, the court held that submission of a bid did not meet the Policy's requirement of producing an "expense." Bethel filed a motion to alter or amend the

4

judgment pursuant to Federal Rule of Civil Procedure 59(e), which the court denied. This appeal followed.

## II

We review the grant of summary judgment de novo. See MarkWest Hydrocarbon, Inc. v. Liberty Mut. Ins. Co., 558 F.3d 1184, 1189 (10th Cir. 2009). The proper interpretation and construction of an insurance policy is a matter of law subject to de novo review. See Ace Am. Ins. Co. v. Dish Network, LLC, 883 F.3d 881, 887 (10th Cir. 2018). Because we exercise diversity jurisdiction, we apply Colorado substantive law. See Specialty Beverages, L.L.C. v. Pabst Brewing Co., 537 F.3d 1165, 1175 (10th Cir. 2008).

Under Colorado law, "[i]nsurance policies are contracts, and must be construed to carry out the intent of the parties." Allstate Ins. Co. v. Starke, 797 P.2d 14, 17 (Colo. 1990). "Whenever possible, the parties' intent must be ascertained from the policy language alone." Id. at 17-18. A court "must enforce an insurance policy as written unless the policy language contains an ambiguity." Cary v. United of Omaha Life Ins. Co., 108 P.3d 288, 290 (Colo. 2005). "A policy provision is ambiguous if it is reasonably susceptible on its face to more than one interpretation." State Farm Mut. Auto Ins. Co. v. Stein, 940 P.2d 384, 387 (Colo. 1997). To determine whether a policy provision is ambiguous, "we must evaluate the policy as a whole and construe the language in harmony with the plain and generally accepted meaning of the words employed, unless the intent of the parties, as expressed in the contract, indicates that an alternative interpretation is intended." Id.

5

## A

We first address Bethel's claim that Berkshire Hathaway breached the Policy by using a real estate appraisal to determine the "actual cash value" of his property. Bethel argues that terms in the Policy's optional additional Replacement Cost coverage and in the Summary unambiguously demonstrate that "actual cash value" means "replacement cost minus depreciation." He therefore contends that Berkshire Hathaway breached the Policy by using the property's market value in compensating him. In contrast, Berkshire Hathaway argues that the term "actual cash value" unambiguously permits it to use market value in valuing the property. The district court agreed with Berkshire Hathaway, concluding that the use of the term "actual cash value" unambiguously allowed several possible methods of valuation, including market value, and that Berkshire Hathaway therefore did not breach the Policy by using the property's market value.

We disagree with the parties and the district court: under the Policy, the meaning of "actual cash value" is ambiguous. If, as in this case, Berkshire Hathaway elects to cover a loss by "paying the value of lost or damaged property," it must value the property at the property's "actual cash value."[1] The Policy itself does not define

---

[1] Coverage under the Policy for direct physical loss of or damage to the property is subject to the Loss Conditions, which provide Berkshire Hathaway, "at [its] option," four courses of action in the event of covered loss or damage: (1) paying the value of lost or damaged property; (2) paying the cost of repair or replacement; (3) taking all or part of the property at an agreed upon or appraised value; or (4) repairing, rebuilding, or replacing the property with other property of the same kind or quality. The Policy further states that Berkshire Hathaway "will

6

"actual cash value," and we conclude that neither the Policy itself nor common meanings of the term provide sufficient guidance as to the parties' intended meaning.

Looking to the "popular[] and generally accepted meaning" of "actual cash value," the district court concluded that the Policy was unambiguous. To divine the term's meaning, the court looked to Couch on Insurance, which delineates "a priority of rules to determine actual cash value . . . : (1) where market value is easily determined, actual cash value is market value, (2) if there is no market value, replacement or reproduction cost may be used, (3) failing the other two tests, any evidence tending to formulate a correct estimate of value may be used." 12 Couch on Ins. 3d § 175:24 (2018). Based on these rules, the district court concluded that Berkshire Hathaway's defining "actual cash value" to mean "market value" did not breach the contract because Berkshire Hathaway presented evidence that (1) it was possible to determine the market value of the property and (2) market value was a superior method of calculation because it was "almost impossible to calculate the amount of depreciation."

---

determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition . . . or an[] applicable provision which amends or supersedes the Valuation Condition." The Valuation Condition in turn provides that the value of covered property will be determined "[a]t actual cash value as of the time of loss or damage." In short, if Berkshire Hathaway decides to pay the value of the property, as it has in this case, it is required to value the property using "actual cash value." But the Policy provides no further information as to how Berkshire Hathaway will determine the property's "actual cash value."

Although the district court's interpretation may be one reasonable reading of the Policy, we disagree with the court's analysis. Our charge is to determine the parties' specific intended meaning when they entered into the Policy. See Starke, 797 P.2d at 17 ("Insurance policies are contracts, and must be construed to carry out the intent of the parties."). Absent unambiguous language, it is not enough to determine the universe of possible meanings, which is all the district court accomplished through its reference to Couch on Insurance.[2] The fact that market value was an available method tells us little about the parties' intended meaning of "actual cash value" in this Policy.[3]

In determining that market value was an acceptable meaning of "actual cash value," the district court cited as persuasive McFarland v. State Farm Fire & Casualty Co., No. 17-CV-00291-MSK-STV, 2017 WL 3034623 (D. Colo. July 18, 2017), in which the court held it was "clear that 'actual cash value' stands for a specific concept in insurance law where the insured is paid only what the asset is worth at the time of loss, a theory of coverage distinct from 'replacement cost,' where the insured

---

[2] To be sure, the parties could have intended for "actual cash value" to include several possible methods, including the prioritized list in Couch on Insurance. However, there is no evidence in the Policy itself that this was the parties' intent. And accepting that a range of meanings sufficiently defines a term as to render it unambiguous would circumvent our charge to determine the specific meaning intended by the parties.

[3] Further, even if we were to accept that the list from Couch on Insurance unambiguously defined "actual cash value," the district court overlooked the parties' dispute regarding the extent to which depreciation was calculable, which in turn would impact the propriety of using market value.

8

receives the amount to replace the asset." Id. at *2. But McFarland's distinction between "actual cash value" and "replacement cost" does not help us determine whether "actual cash value" is the same as "replacement cost without depreciation," as Bethel argues. Although "actual cash value" may very well mean an "insured is paid only what the asset is worth at the time of loss," id., this tells us nothing about how the insurer is to determine what that asset is worth.

## B

Bethel makes two arguments that the Policy unambiguously demonstrates that "actual cash value" means "replacement cost minus depreciation." He first directs us to the Policy's optional "Replacement Cost" coverage, which states that "Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Valuation Loss Condition of" the Policy if the policyholder selects this additional coverage.[4] Bethel argues that because selecting this optional coverage would have allowed him to recoup the replacement cost without depreciation, "actual cash value," as used elsewhere in the Policy, must mean "replacement cost with a deduction for depreciation." We disagree that the Policy unambiguously requires this interpretation. The "Replacement Cost" provision differentiates between "actual cash value" and "replacement cost without deduction for depreciation." Aside from the obvious conclusion that "actual cash value" is not the same as "replacement cost without deduction for depreciation," this provision offers no guidance as to what

---

[4] Bethel does not dispute Berkshire Hathaway's assertion that he did not select this optional "Replacement Cost" coverage for this property.

9

"actual cash value" means. To demonstrate: one could plausibly replace "actual cash value" in the Replacement Cost provision with either party's proposed meaning—"market value" or "replacement cost minus depreciation"—and under either definition, the provision would differentiate between the concepts of "replacement cost without depreciation" and "actual cash value."[5]

Bethel further argues that the Summary provided to him along with the Policy, which defines "actual cash value" as the "cost of repairing or replacing damaged or destroyed property with property of the same kind and quality less depreciation," demonstrated that the parties intended "actual cash value" to mean "replacement cost minus depreciation." The district court concluded that the Summary's definition did not control because the Summary's definition conflicted with the Policy and the Summary limited its own applicability in the event of a conflict.

We disagree with Bethel that the Summary dictates the conclusion that "actual cash value" unambiguously means "replacement cost minus depreciation." The Summary is not part of the Policy and "does not replace any policy provision." It expressly instructs insureds to "read [the] policy for details" and states that "in the

---

[5] Bethel also argues that the "Replacement Cost" coverage sets forth a two-step process that only functions if the Policy defines "actual cash value" to mean "replacement cost minus depreciation." According to him, the Policy first requires an insurer to pay the "actual cash value" of the property—or "replacement cost minus depreciation." Then, after repairs or replacement, the insurer would pay an additional amount reflecting recoverable depreciation. Berkshire Hathaway agrees that the Policy requires a two-step process but argues that this process functions regardless of the method used to determine "actual cash value." We agree: as the Policy is written, either definition of "actual cash value" may be used in the first step of the process.

event of a conflict between the policy and this disclosure form, [the] policy provisions shall prevail." A court may refer to external evidence of the parties' intent only if it has already determined that the contract is ambiguous. See Kuta v. Joint Dist. No. 50(J) of Cntys. of Delta, Gunnison, Mesa & Montrose, 799 P.2d 379, 382 (Colo. 1990) ("Extrinsic evidence is only admissible to prove intent where the terms of the contract are ambiguous."). Because the Summary is not part of the Policy, it cannot support a conclusion that the Policy is unambiguous. To the extent that the district court considered the Summary in determining whether the Policy was unambiguous, it erred.

## C

For these reasons, we conclude that the Policy itself and the definitions used by the district court leave too much ambiguity to conclusively determine the parties' intended meaning of "actual cash value." "Actual cash value" is "fairly susceptible" to both Bethel's and Berkshire Hathaway's proposed interpretations, Dorman v. Petrol Aspen, Inc., 914 P.2d 909, 912 (Colo. 1996), and the district court erred in concluding otherwise. Based on this erroneous conclusion, it granted summary judgment on Bethel's claims for breach of contract, common law bad faith, and unreasonable delay or denial of benefits. We therefore reverse on these claims, and we remand this case to the district court for full consideration of extrinsic evidence bearing on the parties' intended meaning of "actual cash value." See id. ("[O]nce a contract is determined to be ambiguous, the meaning of its terms is generally an issue of fact to be determined in the same manner as other disputed factual issues,"

11

including consideration of "extrinsic evidence of the parties' intentions concerning the term[s]." (quotation omitted)).

This extrinsic evidence should include the Summary. The district court discounted the Summary, concluding that it conflicted with the "Loss Payment" and "Financial Interest" provisions in the Policy. Our review shows no such conflict. As discussed above, the "Loss Payment" provision gives Berkshire Hathaway four options in paying a claim, two of which are (1) paying "the value of lost or damaged property" and (2) paying "the cost of repairing or replacing the lost or damaged property." The district court concluded that defining "value" consistent with the Summary would render these two options redundant. But it overlooked a key phrase in the Summary's definition: "less depreciation." Certainly, both the "Loss Payment" provision and the Summary refer to repair and replacement, but only the Summary refers to repair and replacement <u>minus depreciation</u>.

Additionally, the court concluded that the Summary's definition conflicted with the "Financial Interest" provision, which states that Berkshire Hathaway would not pay an insured "more than [his or her] financial interest in the Covered Property." According to the district court, this provision means only that Berkshire Hathaway would not pay more than the market value of the property. That is incorrect. The "Financial Interest" provision limits recovery by the policy holder to the extent of his or her interest in the property. It does not specify how Berkshire Hathaway is to value that interest.

12

Reading the "Financial Interest" provision in light of the entire Policy further supports this interpretation. See U.S. Fid. & Guar. Co. v. Budget Rent-A-Car Sys., Inc., 842 P.2d 208, 213 (Colo. 1992) ("The meaning of a contract is found by examination of the entire instrument and not by viewing clauses or phrases in isolation."). The provision is located in the "Loss Payment" section of the Policy, which describes how losses will be paid, not in the "Valuation" section, which describes how Berkshire Hathaway will determine the value of lost or damaged property. See Fed. Deposit Ins. Corp. v. Fisher, 292 P.3d 934, 937 (Colo. 2013) (considering section headings and entire instrument to determine meaning of policy provision). Further, an endorsement to the Policy, titled "Loss Payable Provisions," states that John West, a Loss Payee under the Policy, also has a financial interest in the property. Thus, interpreted properly, the "Financial Interest" provision ensures that an insured and a Loss Payee do not receive more than their respective financial interests; it does not specify how Berkshire Hathaway is to value the property.

### III

We turn to Bethel's claim regarding the debris removal coverage in the Policy. Berkshire Hathaway "will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage." After the fire, Bethel submitted a written estimate that he had solicited for debris removal. Berkshire Hathaway responded that Bethel had not submitted any "actual invoices" and

13

requested that he "send [Berkshire Hathaway] the invoices, evidence of payment, and any other applicable documentation for the debris removal expense associated with this Claim." It added that "[t]his information will then be reviewed to determine to what extent the Policy may apply to those expenses."

Granting summary judgment favoring Berkshire Hathaway, the district court concluded that although the Policy did not define the term "expense," an "expense" is "something expended to secure a benefit or bring about a result . . . [i.e., a] financial burden or outlay." Expense, Merriam-Webster, https://merriam-webster.com/dictionary/expense (last visited July 30, 2020). Because Bethel only submitted a bid, i.e., "[t]he offer of a price," Bid, Oxford English Dictionary, https://www.oed.com/view/Entry/18727 (last visited July 30, 2020), the court concluded he did not incur a financial burden and therefore had not complied with his contractual duty to demonstrate an "expense."

On appeal, Bethel expressly does not contest the district court's definitions of "expense" or "bid." Instead, he argues that the term "expense," as used in the Policy, does not require him to have already made a payment. But this is neither what Berkshire Hathaway required nor what the district court concluded. After Bethel submitted the estimate, Berkshire Hathaway asked him to submit "invoices, evidence of payment, and any other applicable documentation for the debris removal expense associated with [his] Claim." Evidence of payment would prove he had incurred an "expense," but so would evidence of an incurred financial burden—e.g., an invoice or contract with an agreed-upon price, even one contingent on receipt of insurance

14

coverage. This observation is consistent with the district court's decision, which held that "expense" commonly meant a "financial burden or outlay." Contrary to Bethel's characterization, the district court did not require him to have already made the payment.

Bethel makes no argument, either before the district court or on appeal, that he incurred a financial burden, either through accepting the estimate he presented or otherwise. His proffered bid only states that "John Cordova propose[s] a bid of $36,700 for the demolition, haul off and backfill of" the property. This proposal on its own does not demonstrate a "financial burden or outlay" and is therefore not an "expense."[6] Without any evidence that Bethel incurred this—or any—expense, we agree with the district court that he has not made the requisite showing of compliance with his contractual burdens. See W. Distrib. Co. v. Diodosio, 841 P.2d 1053, 1058 (Colo. 1992) ("[A] party attempting to recover on a claim for breach of contract must prove . . . performance by the plaintiff."). Accordingly, the district court did not err in granting summary judgment to Berkshire Hathaway on this claim.

## IV

For the forgoing reasons, we **REVERSE** the district court's grant of summary judgment favoring Berkshire Hathaway on Bethel's claims for breach of contract, common law bad faith, and unreasonable delay or denial of benefits. We **AFFIRM**

---

[6] Bethel argues that Berkshire Hathaway "approved" this estimate because its independent adjustor included a different estimated cost for debris removal on a document discussing Bethel's claim. We disagree that the document demonstrates Berkshire Hathaway's approval of Bethel's estimate.

the district court's grant of summary judgment to Berkshire Hathaway on Bethel's claim regarding his debris removal benefit.  This case is **REMANDED** for further proceedings consistent with this opinion.

Entered for the Court

Carlos F. Lucero
Circuit Judge